UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **SEALED INDICTMENT** |
| v. | 23 Cr. |
| PETER WEISER, and THOMAS BRANSKY, | |
| Defendants. | 23 CRIM 514 |

### COUNT ONE
**(Conspiracy to Commit Wire Fraud)**

The Grand Jury charges:

### Overview

1.      From at least in or about 2014 through at least in or about January 2020, PETER WEISER and THOMAS BRANSKY, the defendants, and others known and unknown, conspired to defraud the City of New York (the "City" or "NYC") of millions of dollars through a multi-faceted scheme to corruptly profit from the provision of temporary housing and homeless services in New York City.  BRANSKY, who was the Chief Executive Officer of Childrens [sic] Community Services, Inc. ("CCS"), a purported not-for-profit homeless services provider formed and initially funded at least in part by WEISER, fraudulently steered lucrative service contracts ultimately paid for by the City to a group of affiliated entities owned and controlled by WEISER (the "Weiser Entities").  To carry out their scheme, WEISER, BRANSKY, and other individuals who worked with them, intentionally concealed WEISER's involvement in the formation and operation of CCS and his ownership and control of certain of the Weiser Entities from the City, including by submitting false statements and documents to the City.

2.      PETER WEISER, the defendant, and his associates created the Weiser Entities to profit unlawfully from the City's provision of homeless services by capturing downstream revenues arising from CCS's massive contracts with the City.  For the most part, the Weiser Entities were created for the sole purpose of providing goods and services to CCS.  WEISER attempted to disguise the Weiser Entities as legitimate providers of, among other things, IT services and hardware, security services, office and living furniture, and food services.  In reality, and with few exceptions, the Weiser Entities were fly-by-night companies with no or few employees.  In most cases, the Weiser Entities obtained goods and services from legitimate third-party vendors and then re-sold those goods and services to CCS at marked-up and, in some cases, grossly inflated prices.

3.      PETER WEISER and THOMAS BRANSKY, the defendants, along with their coconspirators, attempted to conceal the scheme from the various City agencies and components responsible for the administration of homeless services.  For example, the defendants and their coconspirators solicited straw owners to appear on paper as the owners of the Weiser Entities when, in reality, WEISER owned, financed, and controlled each Weiser Entity.  Moreover, WEISER, BRANSKY, and their coconspirators made and caused to be made false statements to City officials and personnel about, among other things, the ownership of the Weiser Entities, the interconnectedness of the Weiser Entities, the selection process through which CCS awarded contracts to the Weiser Entities, and the ability and experience of the Weiser Entities in providing quality goods and services.

4.      Likewise, to evade and bypass the City's fraud-detection and cost-saving policies and procedures, PETER WEISER and THOMAS BRANSKY, the defendants, along with their coconspirators, caused CCS to award contracts to the Weiser Entities without using a competitive

bidding process, conducting proper due diligence, completing necessary documentation, or obtaining requisite approvals. When questioned by the City, BRANSKY at times made and caused to be made false statements, including that the required documentation had been misplaced when, in fact, it had never been completed. At other times, WEISER created and/or solicited fictitious competing bids and caused those fictitious bids to be submitted to the City to secure contracts between CCS and the Weiser Entities and to conceal the inflated pricing.

5.     PETER WEISER and THOMAS BRANSKY, the defendants, and their coconspirators, caused CCS – and, as a consequence, the City – to pay the Weiser Entities more than $50 million for goods and services. The City would not have authorized or made these payments had proper and truthful disclosures about the Weiser Entities been made. The fraudulent scheme harmed the City in numerous ways, including: (1) the City paid inflated prices resulting from the unnecessary insertion of middlemen (the Weiser Entities) between legitimate providers of goods and services and CCS; (2) the City paid objectively unreasonable markups for certain goods and services; and (3) CCS's subversion of the mandatory bidding process and concealment of its conflicts of interest exposed the City to the risk—often realized—that the City would not obtain the best value for its money.

6.     Through the scheme, PETER WEISER, the defendant, collected more than $7 million in illicit profits. THOMAS BRANSKY, the defendant, earned more than $1.2 million in salary as the CEO of CCS.

### Childrens Community Services

7.     CCS was formed in 2014, with an address at a UPS store in Laurelton, New York. CCS's first office space was in Cedarhurst, New York. PETER WEISER and THOMAS BRANSKY, the defendants, CCS's Chief Operating Officer ("CC-1"), and other employees of

CCS – many of whom also worked for WEISER and the Weiser Entities at some point – shared a single office. The operation eventually grew and, in 2016, moved to larger office space on Rockaway Turnpike in Lawrence, New York (the "Rockaway Offices"). CCS rented space on the second floor, and the Weiser Entities rented space on the fourth floor of the Rockaway Offices.

8.    At the time of the founding of CCS, THOMAS BRANSKY, the defendant, had no experience in the provision of social services, let alone in providing services to the homeless; nevertheless, he served as CEO of CCS. Both BRANSKY and CC-1 had close relationships with PETER WEISER, the defendant, who had previously served as a property manager for another homeless services non-profit. BRANSKY was WEISER's mentee, and CC-1 was WEISER's longtime employee in other businesses operated by WEISER. While WEISER had no formal executive title at CCS, he exercised substantial control and authority over CCS; indeed, at all relevant times, WEISER was involved in most business decisions, including hiring, contracting, and the day-to-day operations of CCS.

9.    PETER WEISER, the defendant, also had significant influence over CCS's board of directors, which included, at least initially, WEISER himself, THOMAS BRANSKY, the defendant, CC-1, and WEISER's former son-in-law.

10.    Throughout the scheme, PETER WEISER and THOMAS BRANSKY, the defendants, and their coconspirators, including CC-1, concealed WEISER's true role, influence over, and relationship to the principals running CCS in official documents or disclosures. For example, in responding to a document subpoena from the City's Comptroller's Office in or about March 2016, CC-1 caused a CCS employee to remove WEISER's name from CCS board minutes and replace his name with that of WEISER's former son-in-law, who did not join the board until a later date.

11. In addition, CCS concealed that the vast majority of funds loaned to CCS to fund its initial operations—ostensibly private financing from a family trust and from THOMAS BRANSKY, the defendant—were, in fact, from PETER WEISER, the defendant. Because WEISER intended to capture all the downstream subcontractor and vendor contracts from CCS, WEISER and BRANSKY took pains to avoid disclosing that WEISER effectively bankrolled and controlled CCS. In particular:

a. On or about November 6, 2014, CCS executed a loan agreement with a family trust (the "Family Trust") associated with PETER WEISER, the defendant. The loan agreement between the Family Trust and CCS stated that "CCS is starting up a business and does not have the capital to conduct its business [and the Family Trust] is a trust fund that has capital and wants to invest its capital in a business transaction to create income." The loan provided for CCS to pay the Family Trust 6.73% interest and for CCS to request funds from the Family Trust on an as-needed basis. The loan agreement was signed by THOMAS BRANSKY, the defendant, and CC-1, on behalf of CCS, and by WEISER's daughter (who uses a different surname) on behalf of the Family Trust.

b. While the loan agreement stated that the Family Trust was a "trust fund that has capital and wants to invest its capital," in fact the majority of the Family Trust loan funds were derived from PETER WEISER, the defendant, and one of the Weiser Entities. In total, from in or about 2014 through in or about 2017, the Family Trust loaned approximately $2.56 million to CCS. Approximately $2.2 million of those funds were derived from WEISER and one of the Weiser

5

Entities. In total, this arrangement caused CCS (and, by extension, the City) to pay WEISER approximately more than $500,000 in interest payments.

        c.    In addition, on or about April 23, 2014, THOMAS BRANSKY, the defendant, and CCS executed a loan agreement (the "Bransky Loan Agreement"). The Bransky Loan Agreement stated that "Thomas Bransky has capital and wants to lend to CCS." The Bransky Loan Agreement stated that CCS could request funds from BRANSKY on an as-needed basis. However, unlike the loan from the Family Trust, the Bransky Loan Agreement provided for zero-interest borrowing. In total, CCS received $350,000 pursuant to the Bransky Loan Agreement.

        d.    PETER WEISER and THOMAS BRANSKY, the defendants, concealed from the City that WEISER was the source of the funds that BRANSKY loaned to CCS. For the overwhelming majority of the distributions to CCS pursuant to the Bransky Loan Agreement, WEISER transferred funds to BRANSKY, BRANSKY withdrew those funds from his account in cash, and then BRANSKY deposited those funds in CCS's account. Likewise, loan repayments from CCS flowed through BRANSKY's account into WEISER's account, thereby concealing WEISER's direct funding of CCS.

        e.    THOMAS BRANSKY, the defendant, made numerous misrepresentations and/or omissions to the City concerning CCS's financing from PETER WEISER, the defendant, in order to conceal WEISER's influence and control over CCS. For example, in or about April 2018, BRANSKY sent the Department of Social Services ("DSS") records relating to his loan to CCS, including the Bransky Loan Agreement and a CCS board resolution approving the loan. As alleged above, the Bransky Loan Agreement falsely stated that BRANSKY had capital to lend to CCS. The CCS board resolution, dated December 29, 2014, purported to approve a $100,000 loan from BRANSKY to CCS. In reality, there were multiple loans, over time, totaling $350,000.

Indeed, at the time the board resolution was approved, BRANSKY had already loaned $50,000 (which he received directly from WEISER) to CCS.  The board resolution, signed by CC-1 and WEISER's former son-in-law, stated that the loan was from BRANSKY, when in fact it was funded entirely by WEISER.  The board resolution did not disclose WEISER's involvement or the source of the funds.

### The Provision of Homeless Services in the City

12.    Historically, two City agencies have provided the vast majority of housing and services to homeless New Yorkers:  the Human Resources Administration ("HRA") and the Department of Homeless Services ("DHS").[1]  These two agencies operated independently until in or about the spring of 2016 when certain administrative functions—such as procurement and contracting (handled by each agency's Agency Chief Contracting Officer or "ACCO")—were consolidated under the aegis of the Department of Social Services ("DSS").  HRA and DHS each continued to administer and oversee their own respective programs, targeting different populations, with different housing and social support needs.  Each program had its own administrators and staff, who worked with providers to ensure that the providers were taking in new clients in need and providing adequate services, as required by their contracts and the program requirements generally.  Relevant here, DHS/DSS's programs serve multiple populations, including families with children and single adults, by providing emergency and transitional housing in various settings and by providing ancillary services, such as mail delivery, food service,

---

[1] Beginning in or about 1979, New York City has recognized that Article 17 of the New York State Constitution guarantees shelter, to varying degrees, to those who seek it and are determined to be eligible.  As a result, New York City is legally required to provide shelter, on the night it is requested, to anyone who seeks it and is determined to be eligible.

childcare, as well as social and support services. At all relevant times, DHS/DSS maintained offices in Manhattan.

### *The General Contracting and Funding Process*

13.    The process for selecting and awarding contracts for homeless services requires multiple rounds of review and authorization. The City relies on municipal, state, and federal tax dollars to fund its programs and therefore must comply with the procurement laws and regulations set forth in the City Charter and the Rules of the City of New York, in addition to federal regulations governing procurement when, as here, federal programs or funds contribute to the City's services. These rules and regulations are meant to ensure, among other things, transparency, fairness, and accountability in the awarding of City contracts, and to safeguard taxpayer funds from waste or fraud. As relevant here, in or about 2014, the need for shelter and related services was acute, and DHS was seeking to increase its housing capacity. To meet the need, DHS solicited new homeless service providers pursuant to an open-ended request for proposals ("RFP") process, as well as "emergency declarations," issued by the NYC Mayor's Office. The RFPs set out the types of services that the City was seeking and the organizational capacity providers would need to bid for contracts, among other criteria.

14.    At all relevant times, DHS's Capacity Planning and Development unit ("CPD") was responsible for identifying new providers, initiating negotiations, and helping new providers put together a proposed budget that would meet the program requirements set forth in the RFP. The typical process for identifying and putting in place a new provider was as follows: An assistant or deputy commissioner invited prospective providers to meet with DHS representatives from its legal, programs, and budget functions. Prospective providers were then asked about their service model, rates, and experience with sensitive populations. CPD then negotiated initial rates with a

provider. Once CPD approved the initial rate, CPD forwarded the documentation required by the RFP and the approved rate to the DHS/DSS Budget Office. The Budget Office worked with the Provider and with staff in the relevant DHS program (i.e., "Families with Children" or "Single Adults") to generate a line-item budget that included, among other things, proposed costs and salaries that would meet the program's specifications while complying with the procurement rules of the Mayor's Office of Contracting Services ("MOCS"). After the Budget Office approved the line-item budget, the Budget Office sent the proposed budget to the NYC Office of Management and Budget ("OMB") for approval.

15.     Once the negotiated budget was approved by OMB, the RFP package, including the budget, was referred to DHS's Agency Chief Contracting Officer ("ACCO") to begin preparing the contract. Within the ACCO's office, the procurement staff would receive the provider's RFP proposal and conduct due diligence into the service provider and its principals in order to make a "responsibility determination." The ACCO's staff was also responsible for negotiating the terms of the contracts with providers. All contracts with non-profit providers of homeless services were "human services standard agreements" and contained certain standard terms governing conflicts of interest, competitive bidding for sub-contractors and vendors, and clear disclosure and pre-approval requirements before the provider could select and contract with sub-contractors or vendors under the contracts. These terms were non-negotiable, required by municipal law, and, at all relevant times, were standard in DHS's contracts with non-profit providers.

16.     As relevant here, all contracts between DHS and CCS required CCS to, among other things:[2]

---

[2] Over time the Human Services Standard Agreement was revised, but the key language in each of the following provisions remained.

9

        a.        Document and maintain records concerning the "extent of competition," the "method of procurement," and the "basis for selection or rejection of a Provider, consultant or supplier and the basis for the contract price."

        b.        "[S]olicit and document at least three (3) written estimates for any payment made or obligation undertaken . . . for any purchase of goods, supplies, or services for amounts in excess of \$25,000" and to "conduct sufficient market research and/or competition to support its determination that the price of such purchased goods, supplies, services or equipment is reasonable."

        c.        "[S]hall not enter into any subcontract for an amount greater than \$5000 for the performance of its obligation, in whole or in part . . . without the prior approval by the department [DHS] of the subcontractor." Moreover, any proposed subcontractor must execute and submit a disclosure form in New York City's vendor database, "VENDEX," which identifies, among other things, its beneficial owners, place of business, and other business pedigree information.

        d.        "[R]epresent[] and warrant[] that neither it nor any of its directors, officers, members, partners, or employees has any interest nor shall they acquire an interest directly or indirectly, which conflicts in any manner or degree with the performance of this agreement . . . that no person having such interest or possible interest shall be employed or connected with [CCS] in the performance of this Agreement."

        e.        "[F]ully cooperate and comply with the Fiscal Manual."

    17.      Many of the foregoing terms governing competitive bidding, conflicts of interest, and the disclosure and pre-approval of high value subcontracts were also duplicated in the Fiscal Manual issued by DHS. These terms of the DHS human services agreement, among others, were

10

typically discussed with providers during the budgeting process and then, again, with the ACCO's office when the contract was drafted and reviewed with the provider.

18.     Once the ACCO carried out a responsibility determination of the provider, drafted the contract, and the provider executed the contract, the ACCO's office sent the contract to MOCS for approval.  Once MOCS approved the contract, it was sent to the NYC Comptroller's Office, which registered the contract.  Only after a contract was registered could a provider submit invoices (typically on a monthly basis) and receive payment under the contract.

19.     Because the procurement process was lengthy and the need for housing and services threatened to exceed capacity, DHS at times placed homeless clients seeking shelter into housing managed by a new provider whose contract was still pending in the procurement process.  DHS typically placed clients with these pending new providers only if: (1) DHS CPD had completed its initial screening of a provider and approved the provider's initial rate; (2) the DHS Budget Office had reviewed and approved the provider's line-item budget; and (3) OMB had approved the line-item budget.  As a result, providers often began operations—providing accommodation in a hotel room, apartment, or stand-alone shelter, along with varying levels of services—before they were eligible to receive payment from DHS.

20.     Many providers obtained commercial lines of credit before their contracts were registered to finance their operations during the period prior to contract registration. The cost of a line of credit could not be included in their budgets, however, and therefore could not be reimbursed by DHS.  As a result, providers that could demonstrate a critical cash flow need were eligible to apply for short-term bridge loans from the Fund for the City of New York ("FCNY") that were then repaid once the contract was registered and the provider submitted invoices.  The FCNY bridge loan process consisted of a certified application (typically 3-4 pages); review and

approval of the request by DHS; and final authorization of MOCS, which forwarded the request to the FCNY, which issued a loan agreement to the provider. The FCNY loans were then repaid when the contract was registered.

### CCS Becomes a Homeless Shelter Provider

21.     DHS ultimately onboarded CCS as a homeless services provider pursuant to the process set forth in paragraphs 13 to 20 above. THOMAS BRANSKY, the defendant, initially approached a DHS assistant commissioner ("Assistant Commissioner-1") about becoming a homeless services provider in or about February 2014. At that time, in an email to DHS, BRANSKY claimed to represent an organization called "TB Community Services LLC" and claimed to have access to "many apartments that I could furnish and prepare for DHS families," as many as 15 apartments per week. BRANSKY, however, provided few specifics regarding either his ownership or ability to control so much housing, and he did not provide DHS with supporting documentation when asked. Accordingly, Assistant Commissioner-1 did not follow up with BRANSKY.

22.     THOMAS BRANSKY, the defendant, persisted in his attempts to obtain a contract for homeless services with DHS. In or about June 2014, BRANSKY reached out—this time from a CCS email address—to press Assistant Commissioner-1 on the possibility of DHS partnering with BRANSKY in a real estate development project for DHS clients and, separately, to offer DHS up to 500 existing apartments for homeless clients "and the organization to fulfill all the social service requirements for these apartment [sic]." Assistant Commissioner-1 forwarded BRANSKY's email to the then-head of CPD ("Head of CPD-1") and suggested that DHS partner BRANSKY, as a landlord, with an existing DHS homeless service provider. The Head of CPD-1, in turn, suggested this to BRANSKY, but BRANSKY rejected the idea.

23.    In or about July 2014, Head of CPD-1 informed THOMAS BRANSKY, the defendant, that he would have to provide DHS information regarding his staff and organization before his organization could be considered as a DHS service provider.  On or about July 20, 2014, BRANSKY provided this information in an email to Head of CPD-1.  In that email, BRANSKY identified himself as a "Director/CEO" and CC-1 as "Director, CFO," and provided the names, titles, and work experience of other purported CCS staff members, all of whom appeared to have significant background and experience in the provision of services to the homeless.  PETER WEISER, the defendant, was not identified in any capacity in that email.

24.    After CCS provided more information to DHS, in or about September 2014, Head of CPD-1 issued his initial approval of CCS as a potential DHS provider and referred THOMAS BRANSKY, the defendant, and CCS to the DHS Budget Office for budget negotiations.  Once CCS began to negotiate a line-item budget for its apartments with the DHS Budget Office, PETER WEISER, the defendant, participated with BRANSKY in those negotiations on behalf of CCS, although WEISER's formal title was never given.[3]  WEISER typically took the lead in negotiations relating to budgeting and financial matters and, in meetings, BRANSKY looked to WEISER for approval before making decisions.  In fact, the DHS employee handling the budget negotiations ("DHS Employee-1")—who had had no prior contact with CCS until that point—believed that WEISER was "in charge" of CCS and BRANSKY's boss.

25.    Between in or about November 2014 and in or about February 2020, CCS was awarded twelve contracts with DHS (the "DHS Contracts"), for approximately $913 million.  CCS began providing services to DHS clients in private apartments under its first contract

---

[3] In fact, the first mention of WEISER in connection with CCS's provision of services was as a property manager:  CCS's first RFP package to provide housing in private apartments included a contract for property management services between CCS and an entity called "Apex Asset Management LLC."  WEISER signed the contract on behalf of Apex.

("Contract-1") on or about November 1, 2014; Contract-1, however, was not registered with the City Comptroller's Office until 2017 owing to, among other things: CCS's inability to account for its use of an unlicensed and unapproved temp agency (Sasy Enterprises Inc. or "Sasy") owned and controlled by PETER WEISER, the defendant, to hire and train all its employees; CCS's decision to pay Sasy exorbitant "recruiters fees" and to use Sasy to pay its direct payroll; and CCS's inability to explain to DHS's satisfaction the serial irregularities in Sasy's invoices, all as alleged in greater detail below.

26.     One DHS Program Director ("Program Director-1") explicitly explained the conflict-of-interest regulations set forth in paragraph 16 above to THOMAS BRANSKY and PETER WEISER, the defendants. While discussing the possibility that a particular DHS contract could be expanded to include food service, BRANSKY and WEISER proposed, in substance and in part, that WEISER provide the food service. Program Director-1 stated, in substance and in part, that this was unacceptable because, as Program Director-1 understood it, WEISER was a member of CCS's board of directors. BRANSKY then replied, in substance and in part, that WEISER would step down from the board. Program Director-1 reiterated, in substance and in part, that to award the contract to WEISER would effectively constitute a conflict of interest and self-dealing, which DHS would not permit.

### CCS Farms Out Contract Performance to Sasy

27.     Sasy was incorporated by PETER WEISER, the defendant, in 1970, as a clothing company in Brooklyn, New York. WEISER and CC-1 worked together at other WEISER entities in the 1980s, and together at Sasy from at least in or around the mid-1990s. At all relevant times, WEISER was the CEO/President of Sasy and Sasy's registered address was WEISER's personal residence.

28.     From in or about June 2014 through at least in or about 2018, CCS contracted with Sasy for purported recruiting, training, and staffing services, information technology services, and apartment/property preparation services in connection with the DHS Contracts. For these goods and services, Sasy charged CCS significant fees and markups. Sasy, which was not pre-approved or registered with DHS (and was not even properly licensed as a temp agency), was owned and controlled by PETER WEISER, the defendant.

29.     On or about June 12, 2014, CCS awarded Sasy a contract for apartment and property preparation services. THOMAS BRANSKY, the defendant, and CC-1 signed the agreement as directors of CCS, and PETER WEISER, the defendant, signed as president of Sasy. Among the terms of the contract, CCS agreed to pay Sasy $450 for each DHS apartment prepared by Sasy, as well 125% of the costs Sasy incurred in furnishing apartments, purchasing construction materials, and paying the monthly electric and gas bills for the apartments.

30.     In or around June 8, 2016, CCS awarded Sasy a second contract for recruitment, training, and staffing services. THOMAS BRANSKY, the defendant, signed this contract as CEO of CCS, CC-1 signed as a board member of CCS, and an employee of PETER WEISER, the defendant, signed as the "controller" of Sasy. Pursuant to that contract, CCS agreed, in substance and in part, to pay Sasy 43% of the annual gross salary—including fringe benefits and commissions or bonuses—for any job candidates recruited by Sasy and ultimately hired by CCS, and 10% of annual gross salary for training. To be sure, Sasy had begun providing these services well before the June 8, 2016, agreement was signed: beginning at least in or around June 2015, Sasy was handling recruiting for CCS and charged CCS a flat fee of $1900 per employee for "recruiting" and a flat fee of $1700 per employee for "training." CCS, for its part, did virtually no independent hiring or training, all of which appears to have been "outsourced" to Sasy.

15

31.     Also in or about June 2016, Sasy and CCS entered into an agreement for IT and computer services.  In this agreement, CCS agreed, in substance and in part, to pay Sasy "1.35 of purchase cost" for all "Computers, Printers, Scanners, Hot Spots, Electronic devices" and "1.25 of purchase cost" for "Furniture, File Cabinets."  It also provided, in substance and in part, that for each "office"—a term which goes undefined—CCS would pay $3,000 to set up each computer and corresponding office equipment.  Finally, the contract provided that CCS would pay Sasy "$100 per Month times the number of individual computers" for "On Site Maintenance."

32.     In or about April 2015, CCS began applying for bridge loans from the FCNY to cover its operating expenses until its pending contracts under the Cluster Site and Hotel programs had been registered by the New York City Comptroller's Office.  As CCS began applying for bridge loans more and more frequently—and for larger and larger amounts—the DHS/DSS ACCO began to question the amounts that CCS was requesting, in particular for its payroll.  When the ACCO's office finally received some of the back-up documentation to justify CCS's high payroll spending as reflected on its bridge loan applications, CCS's reliance on Sasy emerged.  In a November 2016 email to THOMAS BRANSKY, the defendant, the ACCO for DHS/DSS questioned the use of Sasy and requested various categories of back-up documents and information, stating, "I cannot get this loan approved until we have an explanation."  CCS responded and provided some documents to address the amounts charged by Sasy (and how they were reflected in the payroll expenses CCS submitted), but each round of documents or invoices that CCS submitted revealed new discrepancies, such as the amounts invoiced not reflecting the amounts sought in bridge loans; the invoices themselves being higher than the ultimate payroll; and costs labeled as "benefits" that totaled nearly 60% of payroll itself.  The DHS/DSS ACCO

continued to press for additional documentation about Sasy and explained to BRANSKY that the 150% temp agency fee that Sasy charged was unreasonable.

33.    Rather than provide the documentation—such as price lists—requested by DHS/DSS, which would have revealed the exorbitant fees and markups that Sasy was charging, on or about December 2, 2016, THOMAS BRANSKY, the defendant, informed DHS/DSS that Sasy was willing to transfer all employees to CCS and forgo all future fees if its $13 million in open invoices to CCS were paid in full through DHS/DSS's bridge loan program.  DHS/DSS refused to pay these outstanding Sasy invoices beyond direct payroll.  Around the same time, in or about December 2016, PETER WEISER, began setting up the Weiser Entities to replace Sasy.

### The Weiser Entities

34.    PETER WEISER and THOMAS BRANSKY, the defendants, and their coconspirators, caused CCS to obtain, among other goods and services, IT services and hardware, temp and personnel services, cleaning services, security services, office and living furniture, food services, and real estate brokerage services, from the Weiser Entities.  The allegations set forth below, ¶¶ 35-80, *infra*, provide examples of the ways in which WEISER, BRANSKY, and their coconspirators used the Weiser Entities to defraud the City.

### *IT Services and Hardware: AZ Security and Delta*

35.    At all relevant times, AZ Security Services LLC ("AZ Security") and Delta IT Solutions LLC ("Delta") were controlled by PETER WEISER, the defendant, and were created and/or used to provide IT services and hardware to CCS at inflated prices.  While AZ Security and Delta had straw owners and CEOs, WEISER was the true owner and operator of both companies.

***AZ Security***

36.     The original officer and manager of AZ Security was an individual ("Weiser Associate-1") who, at the time AZ Security was formed, was in his early 20s, had not completed high school, and was unemployed.  In or around the fall of 2015, THOMAS BRANSKY, the defendant, who had met Weiser Associate-1 years earlier, introduced Weiser Associate-1 to PETER WEISER, the defendant, for the purpose of using Weiser Associate-1 as a straw owner. BRANSKY described WEISER to Weiser Associate-1 as BRANSKY's "business partner."  In a meeting among WEISER, CC-1, and Weiser Associate-1, WEISER explained to Weiser Associate-1, in substance and in part, that CCS was a non-profit that provided housing and that he, WEISER, was establishing separate for-profit companies to provide goods and services to CCS. WEISER explained, in substance and in part, that the Weiser Entities could not be affiliated with CCS because CCS was not allowed to turn a profit.  WEISER then asked Weiser Associate-1, in substance and in part, to serve as the owner of AZ Security on paper and explained that Weiser Associate-1 would not have to do any work and would be compensated for his role as straw owner. Weiser Associate-1 agreed to the arrangement.  Following his initial meeting with WEISER and CC-1, Weiser Associate-1 signed documents to create AZ Security and helped open a bank account. About a month later, Weiser Associate-1 told BRANSKY and CC-1, in substance and in part, that the arrangement did not seem right.  Several weeks later, Weiser Associate-1 signed documents that purported to transfer 98% of AZ Security to WEISER's spouse and 2% of the company to another individual ("Weiser Associate-2").

37.     On or about November 17, 2015, an email account controlled by PETER WEISER, the defendant, emailed the AZ Security corporation documents to Weiser Associate-2.  Later that day, THOMAS BRANSKY, the defendant, emailed CC-1, "remember to send [Weiser

Associate-2] paper work [sic] for az." CC-1 responded, "we sent it to him yesterday Monday 11/16/15 from peters email."

38.     In or about September 2019, which, as described below, was around the time that the City questioned the legitimacy of AZ Security, PETER WEISER, the defendant, caused the ownership of AZ Security to be transferred from his spouse to another individual ("Weiser Associate-3"). WEISER, who lived in the same luxury apartment building as Weiser Associate-3's parents, told Weiser Associate-3, in substance and in part, that WEISER was in litigation with the City, and therefore he did not want the City to know about his affiliation with AZ Security. WEISER therefore proposed, in substance and in part, that AZ Security be registered in Weiser Associate-3's name, that WEISER would continue to run the company as usual, and that Weiser Associate-3 would receive 50% of the profits and a percentage of any additional business he generated. Weiser Associate-3 accepted the offer. WEISER's bookkeeper ("CC-2") then met with Weiser Associate-3 at Weiser Associate-3's office. During that meeting, CC-2 had Weiser Associate-3 sign an Assignment of Membership Interest contract, which transferred AZ Security from Weiser's Spouse to Weiser Associate-3 and falsely stated that Weiser Associate-3 had paid $10,000 to buy AZ Security. CC-2 then registered AZ Security in Weiser Associate-3's name in PASSPort, the City's procurement management system, falsely listing Weiser Associate-3 as the owner of AZ Security and providing a false address as the business address for AZ Security, when, in fact, AZ Security operated out of WEISER's office, in the same building as CCS.

39.     From in or about September 2016 through at least in or about May 2019, CCS contracted with AZ Security to provide IT services in connection with the DHS Contracts. In a September 1, 2016 one-page agreement signed by CC-1 on behalf of CCS, CCS agreed to pay $3,200 per week to AZ Security for "maintain[ing] all computers, copy machines, printers/fax

machines, and internet connections in all of the [CCS] facilities." In the same contract, CCS agreed

to pay $3,500 "for the set up of any new offices." In another September 1, 2016, agreement (signed

by CC-1 on behalf of CCS), CCS agreed to retain AZ Security for the same services and pay

structure for a CCS shelter located in Brooklyn. That contract was subsequently amended and

provided for $500 weekly payments. CCS and AZ Security also entered into several other

agreements, including a set of agreements from July 2018. In the July 2018 contracts, CCS

retained AZ Security, in exchange for weekly fees, to maintain "off-site and, if necessary, on site-

IT support and maintenance" at certain CCS facilities, including the CCS administration offices,

CCS hotels, a particular family shelter and a shelter for single men.

40.     AZ Security was created and operated so that PETER WEISER, the defendant,

could profit from the IT-related revenues arising from CCS's contracts with the City, including

through unjustified markups that would not have been possible had CCS used a legitimate

competitive bidding process and disclosed the conflict of interest in using AZ Security to the City.

Internal AZ Security records reflect significant markups for goods that AZ Security purchased

from common retail vendors (such as Amazon and Staples) and resold to CCS. For example, an

internal AZ Security pricing list from 2018 reflects markups of up to 102% for items such as

computer monitors, desktop computers, and printers. The same price list reflects separate charges

for installation and setup, which was on top of the monthly charges that CCS paid to AZ Security

for IT "support and maintenance."

41.     While AZ Security had a handful of employees, most were part-time and lacked

formal IT training. For example, AZ Security's manager was self-taught and worked at a local

pharmacy stocking shelves and as a cashier prior to working at CCS and AZ Security.

42.     In early 2019, DHS began to question the legitimacy of AZ Security.  In an April 2019 email exchange between DHS and CCS, a DHS employee questioned why AZ Security charged a separate installation charge on top of a monthly IT services charge.  Apparently unsatisfied with CCS's responses, the DHS employee asked for a summary of the vendor selection process that led to the contracts between CCS and AZ Security.  A CCS employee responded, copying, among others, THOMAS BRANSKY, the defendant, and CC-1, that AZ Security met "specialized requirements."  When asked about these "specialized requirements," BRANSKY drafted a response email, which CCS then sent to the DHS, falsely stating that AZ Security "had a track record of performing" specified and specialized functions.  But AZ Security had no track record at all because it was created to service CCS.  When DHS asked whether AZ Security was an affiliate of CCS in any way, either through familial relationship or interlocking ownership, a CCS employee, copying BRANSKY and CC-1, falsely wrote "AZ Security is not affiliated with CCS in any way."

43.     On July 12, 2019, DHS conducted a site visit to AZ Security's registered address, which was a shipping store where the company received mail.  Later that day, DHS requested that CCS provide additional documentation to confirm the legitimacy of the purchases from AZ Security.  A CCS employee, in a July 16, 2019, email in which THOMAS BRANSKY, the defendant, and CC-1 were copied, provided information that AZ Security was owned by an individual (the wife of PETER WEISER, the defendant), and provided the address of the shipping center where AZ Security received mail.  The next day WEISER directed one of his employees ("Weiser Associate-4") urgently to rent office space for AZ Security.  Weiser Associate-4 found office space, and WEISER directed her to sign the lease by forging the signature of Weiser Associate-3, who was then the straw owner of AZ Security.  In a July 23, 2019 email chain with

21

DHS, BRANSKY, who was asked about whether CCS sought out other bids for computer equipment, falsely claimed that "[w]e used the bidding process, but due to staff turnover in the accounting department, we cannot locate the bids" and that "[w]e priced out computer and software installations with various outlets, including Office Depot, Amazon, Best Buy, etc."

44.      From in or about 2016 through in or about 2020, PETER WEISER and THOMAS BRANSKY, the defendants, caused CCS to pay AZ Security approximately $1.4 million for IT services and hardware.  Of these payments from CCS to AZ Security, more than approximately $516,000 was transferred to an account in the name of the spouse of PETER WEISER, the defendant, and ultimately on to WEISER's account, as further discussed in paragraph 80, *infra*. The balance of the $1.4 million was transferred to other Weiser Entities.

### *IT Services and Hardware: Delta*

45.      In or about December 2016, PETER WEISER, the defendant, and his associates created Delta to sell additional IT services and hardware to CCS at inflated prices and in violation of the City's conflict-of-interest policies.   At all relevant times, Weiser Associate-4 was the straw owner and CEO of Delta.  However, in reality, WEISER owned and controlled Delta.  Delta's startup financing was loaned by WEISER and transferred through Weiser Associate-4's personal bank account to conceal WEISER's ownership and control of Delta.

46.      At the direction of PETER WEISER, the defendant, Weiser Associate-4 rented office space for Delta on Long Island.  While the Long Island office address was listed as Delta's office, for the most part Delta-related business was conducted out of the fourth floor of the Rockaway Offices, where WEISER worked, and in the same office building where CCS's offices were located.  WEISER warned his associates that the Weiser Entities, such as Delta, could not be connected to the Rockaway Offices, where CCS's front-office operations were located.  For

example, in a July 2019 email to Weiser Associate-4, WEISER made corrections to a Delta brochure prepared by Weiser Associate-4: "PLEASE TAKE OUT THE ADDRESS FROM ANY BROCHURE OR ADVERTISEMENT. PLEASE REMOVE [THE ROCKAWAY OFFICES' ADDRESS]."

47.     PETER WEISER, the defendant, corruptly profited from Delta's revenues arising from CCS's contracts with the City, including through unjustified markups that would not have been possible had CCS gone through the required competitive bidding process and disclosed the conflict-of-interest. Internal Delta records reflect significant markups for goods that Delta purchased from vendors (such as Amazon and Staples) and resold to CCS. For example, an internal Delta pricing list from 2019 shows markups of up to 330% for items such as routers, printer cables, and surge protectors. Likewise, Delta charged a 331% markup for telecom services that Delta obtained from a third-party provider. These exorbitant markups were not disclosed to the City.

48.     In the summer of 2019, CCS accepted a proposal from Delta to provide and maintain computer servers and to manage IT services, including maintenance of firewalls and PC upgrades (the "2019 IT Services"). The Delta proposals had a price tag of more than $800,000. While, on paper, Delta was to provide the 2019 IT Services, in reality, WEISER had arranged for a third-party IT-services company to provide the hardware and services in Delta's name. WEISER, in turn, marked up the prices charged by the third-party company between approximately 20% and 104% in charging CCS on behalf of Delta.

49.     To bypass the City's fraud-detection and cost-saving policies and procedures, and to conceal Delta's inflated prices from the City, PETER WEISER, the defendant, created and caused to be created fictitious competing bids for the 2019 IT Services. For example, one of the

23

fictitious bids was submitted by a small IT company based on Long Island, New York (the "Long Island IT Company"). In or about June 2019, WEISER met with the owner of the Long Island IT Company and explained, in substance and in part, that WEISER owned a network of businesses, including an IT company, and that CCS had several IT needs. WEISER then explained, in substance and in part, that in order to secure a contract with CCS, CCS needed competing bids with pricing higher than Delta's proposed pricing. WEISER suggested, in substance and in part, that in exchange for submitting a fictitious bid for the 2019 IT Services, WEISER would pass some of the work awarded to Delta on to the Long Island IT Company. The owner of the Long Island IT Company agreed to WEISER's proposal and submitted a fictitious bid for the 2019 IT Services. In every instance, the Long Island IT Company's pricing was higher than Delta's proposed pricing.

      50.    While reviewing the proposals for the 2019 IT Services – which had already been accepted by CCS and submitted to the City for final approval – a CCS employee noticed that the fictitious competing bids looked very similar; the formatting was almost identical and the wording was nearly the same. This raised the prospect, to the CCS employee, that the competing bids were illegitimate. The CCS employee addressed this concern with THOMAS BRANSKY, the defendant, during a telephone call recorded by the CCS employee. On this phone call, the CCS employee, in substance and in part, expressed concern that the bids were "not real" and that "it may have even been a vendor [Delta] who reached out for the other proposals and is submitting it to [CCS] as though [CCS] got three proposals." BRANSKY suggested, incorrectly, that it was proper for a vendor, instead of CCS, to solicit competing bids: "the majority of the bids that I get, I ask the vendor to go get the other bids." The CCS employee noted, in substance and in part, "to me, that's not us collecting three bids," and observed that a vendor soliciting its own competition would be incentivized to get "two crazy expensive" bids. BRANSKY responded in substance and

in part, falsely, that the City was aware of this process of having vendors solicit their own competing bids: "The City of New York knows that's the process." During the recorded telephone call, BRANSKY falsely stated that the City's requirement of soliciting three competing bids was a mere formality: "there's a certain box that they need to check off." Several days later, PETER WEISER, the defendant, approached the CCS employee and stated, in substance and in part, that any bid submitted to CCS counts as a competing bid even if not solicited by CCS.

51.    From in or about 2017 through 2020, PETER WEISER and THOMAS BRANSKY, the defendants, caused CCS to pay Delta more than $1.5 million for IT services. Delta, in turn, transferred significant portions of those fraudulent proceeds to WEISER and other Weiser Entities.

### Security Services: Priority 1 Security, LLC

52.    In or about July 2017, PETER WEISER, the defendant, and his associates created a security company ("Priority 1")—at the time, known as Priority 1 Security, LLC—in order to sell security services to CCS. WEISER solicited an individual ("Weiser Associate-7") with a law enforcement background to own and help run the day-to-day operations of Priority 1. While Priority 1's business formation documents listed Weiser Associate-7 as the company's owner, WEISER was the true owner and exercised control over the company. Likewise, Weiser Associate-7's home address was used as Priority 1's business address but, in reality, Priority 1 operated from the Rockaway Offices, where CCS's offices were located.

53.    Weiser Associate-7 understood, based on conversations with PETER WEISER, the defendant, that CCS would award a contract to Priority 1 irrespective of a competitive bidding process. In that regard, WEISER asked Weiser Associate-7, in substance and in part, whether Weiser Associate-7 knew of other security firms that would be willing to submit a proposal to CCS in order to paper CCS's files. Weiser Associate-7 declined, writing in a December 2017 email to

WEISER, "I couldn't think of anyone I know in security who would be comfortable just throwing down a proposal as a third candidate. I'm sorry."

54.     The relationship between PETER WEISER, the defendant, and Weiser Associate-7 deteriorated, and in or about October 2018, WEISER caused the ownership of Priority 1 to be transferred to a shell entity owned by WEISER and WEISER's personal driver, and WEISER recruited another individual ("Weiser Associate-8") with a law enforcement background and the necessary licenses to help run the day-to-day operations of Priority 1. In or about 2019, WEISER and his associates created a new entity, Priority-1 Security Services LLC, when they discovered that they had inadvertently included WEISER's name in a Priority 1 submission to the City. WEISER continued to control the operations and finances of Priority 1, irrespective of the change in registered owner or corporate name.

55.     From in or about September 2017 through 2020, Priority 1 provided security services to CCS. During that same period, CCS paid Priority 1 more than approximately $28.6 million. Priority 1, in turn, transferred significant portions of those fraudulent proceeds to PETER WEISER, the defendant, and other Weiser Entities. For example, Priority 1 transferred approximately $2.3 million to KPM Business Development LLC ("KPM") and approximately $590,000 to White & Rosen PSF LLC ("White & Rosen"), both entities which WEISER controlled. Those entities, in turn, transferred significant portions of the fraudulent proceeds to WEISER. As set forth below in greater detail, most of the transfers from Priority 1 to other Weiser Entities had no legitimate business purpose and were executed to conceal the fraudulent nature of the scheme and launder the fraud proceeds to WEISER.

*Furniture and Supplies:  AMX Distributors, LLC*

56.    In or about September 2017, PETER WEISER, the defendant, and one of his associates ("Weiser Associate-5") created AMX Distributors, LLC ("AMX") to source and supply various consumer goods, including furniture, to CCS at inflated prices and in violation of the City's conflict-of-interest policies.    WEISER completed and caused to be completed the business formation documents and seeded most of the startup costs of AMX.    AMX was registered to Weiser Associate-5's home address to conceal WEISER's ownership and the corrupt arrangement between CCS and the Weiser Entities.

57.    At all relevant times, the City required significant vendors to be registered in PASSPort before providers, such as CCS, could do business with them.    To register, a vendor must provide, among other things, information that is designed to detect potential conflicts of interest. AMX, like other Weiser Entities, made a series of false statements in its PASSPort registration form, with the intent of disguising the conflicts of interest arising from the involvement of PETER WEISER, the defendant.    For example, AMX's PASSPort submission to the City stated that it was not a subsidiary or controlled by any other entity and that it did not share office space, staff, expenses, or equipment with other entities, even though AMX shared office space and staff with other Weiser Entities, which also provided services to CCS.    Those statements were materially false and misleading and were designed to deceive the City and conceal the fraudulent scheme.

58.    Through AMX, PETER WEISER, the defendant, sold furniture and supplies to CCS, including, among other things: beds, mattresses, sheets, towels, pillows, sofas, cribs, microwaves, refrigerators, chairs, tables, and toiletries.    WEISER sold these goods to CCS at unjustified markups of up to 309%.

27

59.     From in or about 2017 through in or about 2020, PETER WEISER and THOMAS BRANSKY, the defendants, caused CCS to pay AMX more than $1.5 million.  AMX, in turn, transferred significant portions of those fraudulent proceeds to WEISER and other Weiser Entities.

### *Cleaning Services: Pronto Cleaning Services, LLC*

60.     In or about February 2019, PETER WEISER, the defendant, and his associates created Pronto Cleaning Services, LLC ("Pronto") in order to sell cleaning services to CCS at inflated prices and in violation of the City's conflict-of-interest policies.  At all relevant times, one of WEISER's associates ("Weiser Associate-6") was the registered owner and CEO of Pronto.  However, in reality, WEISER owned and controlled Pronto.

61.     Pronto contracted with a legitimate janitorial services company to provide cleaning services at CCS offices and facilities.  Pronto, which had no employees, resold those cleaning services to CCS at an approximately 56% markup.

62.     In addition to concealing this arrangement from the City, PETER WEISER, the defendant, hid this arrangement from the legitimate janitorial services company that was actually providing the cleaning services to CCS.  For example, in a March 2019 email exchange between CC-2 (WEISER's bookkeeper) and an insurance broker, CC-2 explained, "the vendor . . . we use does not know that we are using them as a sub contractor and Peter does not want them to know. For all they know, they are cleaning OUR offices . . . ."

63.     From in or about 2019 through 2020, PETER WEISER and THOMAS BRANSKY, the defendants, caused CCS to pay Pronto more than $51,000 for cleaning services.  Significant portions of those fraudulent proceeds were transferred to WEISER and another Weiser Entity.

***Real Estate Broker Services: PK Realty***

64.     In or about 2017, PETER WEISER, the defendant, created and caused to be created PK Realty Management LLC ("PK Realty"), a purported real estate brokerage company. The company was registered to another individual ("Weiser Associate-9"), who was involved in various real estate projects.

65.     THOMAS BRANSKY, the defendant, was friendly with Weiser Associate-9's family and, for a short period, lived in Weiser Associate-9's family home. In or about 2017, BRANSKY solicited Weiser Associate-9's involvement in sourcing buildings that CCS could use to house the homeless pursuant to CCS's contracts with the City. BRANSKY introduced WEISER and Weiser Associate-9 and suggested that they work together.

66.     In sourcing potential housing units for CCS, Weiser Associate-9 contacted a real estate investment and development firm and its affiliates (the "Real Estate Firm") that Weiser Associate-9 knew from his work in the industry. Over the course of several meetings among THOMAS BRANSKY, the defendant, Weiser Associate-9, and representatives of the Real Estate Firm, the Real Estate Firm agreed to lease shelter units and hotel rooms to CCS. However, PETER WEISER, the defendant, proposed, and BRANSKY negotiated, a "finder's fee" that the Real Estate Firm would pay to PK Realty from funds it received from CCS. For example, the Real Estate Firm agreed to pay PK Realty 5.75% of all funds that CCS paid to the Real Estate Firm relating to a specific location. While the Real Estate Firm initially objected to this "finder's fee" arrangement, BRANSKY assured the Real Estate Firm that he could get the City to pay the maximum rate per room, thus enabling the Real Estate Firm to earn a satisfactory profit while still paying the "finder's fee" to PK Realty and, indirectly, to PETER WEISER, the defendant.

Through this arrangement, BRANSKY caused CCS – and, as a result, the City – to pay higher rates for the shelter units and hotel rooms.

67.     PK Realty was registered in Weiser Associate-9's name and to Weiser Associate-9's home address to conceal PETER WEISER's, the defendant's, ownership and control of the company. For the same reason, PK Realty's initial funding, from WEISER, was transferred through Weiser Associate-9's personal bank account to PK Realty.

68.     From in or about 2017 through in or about 2020, the Real Estate Firm – and ultimately the City – paid PK Realty more than approximately $826,000. Other than the payments from the Real Estate Firm, PK Realty did not have any other significant income. Almost all those fraudulent proceeds were transferred to PETER WEISER, the defendant, and the WEISER Entities.

### *Real Estate Broker Services: 511 Realty*

69.     At all relevant times, 511 Realty Management, LLC ("511 Realty") was registered to PETER WEISER's, the defendant's, adult son. In reality, WEISER controlled and operated 511 Realty. 511 Realty was registered to one of WEISER's children and to the home address of another one of WEISER's adult children in order to conceal WEISER's involvement with the company.

70.     From in or about September 2017 through at least in or about 2019, CCS contracted with 511 Realty to lease certain residential and commercial properties. However, 511 Realty provided no legitimate services. Instead, 511 Realty made monthly rent payments to third-party landlords on CCS' behalf. For this, 511 Realty charged hefty markups to CCS, and, as a result, the City. For example, CCS would make monthly payments to 511 Realty of approximately $24,000 for CCS' office space in the Rockaway Offices. 511 Realty, in turn, would pay the landlord $17,500 monthly, representing a 37% markup, for essentially doing nothing more than

writing a check; the markup increased to 46% by in or around 2019. WEISER also used 511 Realty to pay the rent on behalf of other Weiser Entities.

71.    At all relevant times, Weiser Associate-5 was 511 Realty's only employee. Weiser Associate-5 performed no actual work other than making monthly rent payments and sending invoices to CCS and other Weiser Entities. WEISER directed the markups by writing the markup amount on Post-It notes and passing the Post-It notes to Weiser Associate-5.

72.    From in or about 2017 through 2020, PETER WEISER and THOMAS BRANSKY, the defendants, caused CCS to pay 511 Realty more than approximately $1.7 million for "rent." 511 Realty, at WEISER's direction and control, then transferred significant portions of those fraudulent proceeds to WEISER, WEISER's son, and other Weiser Entities.

### *Staffing Services: Receptionist & Staff, LLC, d/b/a "R&S Resources"*

73.    In or about December 2016—around the time that the City was questioning the legitimacy of Sasy—PETER WEISER, the defendant, and Weiser Associate-6 created Receptionist & Staff, LLC, d/b/a "R&S Resources" ("R&S"). Weiser Associate-6 served only as a straw owner; WEISER made all business decisions at R&S and controlled the company. WEISER provided the original financing for R&S, which was transferred through Weiser Associate-6's bank account to an R&S account in order to conceal WEISER's involvement.

74.    PETER WEISER, the defendant, created R&S to replace Sasy as a staffing agency after the City questioned the use of Sasy. R&S hired, among other positions, residential aides, shift supervisors, call center dispatchers and operators, program directors, office assistants, and case managers for CCS. R&S charged CCS markups of between 20% and 45% of each hired employee's annual salary.

31

75.    From in or about 2017 through in or about 2019, PETER WEISER and THOMAS BRANSKY, the defendants, caused CCS to pay R&S more than approximately $716,000. More than $100,000 of those proceeds were transferred from R&S to WEISER.

### WEISER's Efforts to Launder the Fraudulent Proceeds

76.    PETER WEISER and THOMAS BRANSKY, the defendants, caused CCS to transfer more than $50 million to the Weiser Entities. As alleged in greater detail above, WEISER caused the Weiser Entities to transfer the fraudulent proceeds to other Weiser Entities. In some cases, fraudulent proceeds were transferred through multiple Weiser Entities. Most of these transactions had no legitimate business purpose and were executed with the intent to disguise and conceal the source, ownership, and control of the fraudulent proceeds.

77.    Most of the proceeds were laundered through two shell companies, KPM and White & Rosen. Both KPM and White & Rosen were created in 2018 and registered to CC-2. In reality, PETER WEISER, the defendant, owned and controlled both entities. KPM and White & Rosen were used as vehicles to launder the proceeds of the scheme to defraud the City.

78.    For example, as a result of the fraudulent scheme, from in or about September 2017 through 2020, PETER WEISER and THOMAS BRANSKY, the defendants, caused CCS to pay Priority 1 more than approximately $28.6 million. WEISER then transferred and caused to be transferred $2.3 million from Priority 1 to KPM and approximately $590,000 from Priority 1 to White & Rosen. The transfers from Priority 1 to KPM and White & Rosen had no legitimate business purpose and were executed to conceal and disguise the fraudulent nature of the scheme, as well as the source, ownership, and control of the fraudulent proceeds.

79.    To further conceal the fraud, PETER WEISER, the defendant, created and caused to be created multiple invoices from KPM to Priority 1 for alleged "Consulting Services." KPM

provided no legitimate "Consulting Services" to Priority 1, and the invoices were created to conceal the fraudulent scheme and to falsely justify the many illicit transfers of fraudulent proceeds from Priority 1 to KPM.

80.     In addition to laundering fraudulent proceeds through the Weiser Entities' bank accounts, PETER WEISER, the defendant, laundered proceeds through individuals' bank accounts.  WEISER transferred fraudulent proceeds through his wife's bank account, among others, in order to conceal and disguise the fraudulent nature of the scheme and the source, ownership, and control of the proceeds.  For example, in a April 2019 text message exchange, WEISER and Weiser Associate-4 discussed transferring fraudulent proceeds from AZ Security through WEISER's spouse's account and ultimately to WEISER:

| Weiser Associate-4: | Sunday I sent $50,000 from AZ to [your wife] Then I sent from [your wife] to you $25,00[0] Today I send [sic] another $50,000 from AZ to [your wife] |
|---|---|
| WEISER: | Please send all 100 to Pw [PETER WEISER] 4x25,000 |

## **STATUTORY ALLEGATIONS**

81.     The allegations contained in paragraphs 1 through 80 of this Indictment are repeated and realleged as if fully set forth herein.

82.     From at least in or about 2014 through at least in or about January 2020, in the Southern District of New York and elsewhere, PETER WEISER and THOMAS BRANSKY, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

33

83.    It was a part and an object of the conspiracy that PETER WEISER and THOMAS BRANSKY, the defendants, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, WEISER, BRANSKY, and others engaged in a scheme to defraud the City through CCS and the Weiser Entities, including by making and causing to be made false statements to the City in order to obtain money, which scheme was furthered by electronic communications and bank wires to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Section 1349.)

### COUNT TWO
### (Wire Fraud)

The Grand Jury further charges:

84.    The allegations contained in paragraphs 1 through 80 of this Indictment are repeated and realleged as if fully set forth herein.

85.    From at least in or about 2014 through at least in or about January 2020, in the Southern District of New York and elsewhere, PETER WEISER and THOMAS BRANSKY, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, WEISER, BRANSKY, and others

34

engaged in a scheme to defraud the City through CCS and the Weiser Entities, including by making and causing to be made false statements to the City in order to obtain money, which scheme was furthered by electronic communications and bank wires to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Embezzlement of Government Funds)

The Grand Jury further charges:

86.    The allegations contained in paragraphs 1 through 80 of this Indictment are repeated and realleged as if fully set forth herein.

87.    From at least in or about 2014 through at least in or about January 2020, in the Southern District of New York and elsewhere, PETER WEISER and THOMAS BRANSKY, the defendants, while acting as an agent of an organization that received in any one-year period benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, and other form of federal assistance, to wit, CCS, did willfully and knowingly embezzle, steal, obtain by fraud, and otherwise without authority did knowingly convert to the use of a person other than the rightful owner and intentionally misapply property that was valued at $5,000 and more and was owned by and was under the care, custody, and control of such organization, to wit, BRANSKY, while acting as the CEO of CCS, and with WEISER's aiding, abetting, counseling, commanding, and inducing, fraudulently caused CCS to award lucrative contracts for goods and services to entities controlled by WEISER, without competitive bidding, for inflated and otherwise unnecessary expenses that were paid with funds from DHS and DSS.

(Title 18, United States Code, Sections 666(a)(1)(A) and 2.)

## COUNT FOUR
### (Money Laundering)

The Grand Jury further charges:

88.    The allegations contained in paragraphs 1 through 80 of this Indictment are repeated and realleged as if fully set forth herein.

89.    From at least in or about 2014 through at least in or about January 2020, in the Southern District of New York and elsewhere, PETER WEISER, the defendant, knowing that the property involved in financial transactions represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such financial transactions, which transactions affected interstate and foreign commerce and involved the use of financial institutions which were engaged in, and the activities of which affected, interstate and foreign commerce, and which in fact involved the proceeds of specified unlawful activity, to wit, the wire fraud charged in Count Two of this Indictment, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity.

(Title 18, United States Code, Section 1956(a)(1)(B)(i).)

### FORFEITURE ALLEGATIONS

90.    As a result of committing the offenses alleged in Counts One, Two, and Three of this Indictment, PETER WEISER and THOMAS BRANSKY, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

91. As a result of committing the offense alleged in Count Four of this Indictment, PETER WEISER, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property.

## Substitute Assets Provision

92. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third person;

      c.    has been placed beyond the jurisdiction of the Court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981 and 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON

Danian William
DAMIAN WILLIAMS
United States Attorney